**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

---------------------------------------------------------------------X

HALLMARK LICENSING, LLC,

        Plaintiff,

                                                    Case No.: 24-cv-00112

     v.

THE PARTERNSHIPS and UNINCORPORATED
ASSOCIATIONS IDENTIFIED ON SCHEDULE "A",

        Defendants.
---------------------------------------------------------------------X

## DEFENDANT'S REPLY TO PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO VACATE DEFAULT JUDGMENT [62]

Defendant kekeduck ("Defendant"), by and through their undersigned attorneys, respectfully submits this reply to Plaintiff's response in opposition to Defendant's motion to vacate and/or set aside default judgment (the "Reply"). In support of the Reply, Defendant respectfully states as follows:

## ARGUMENT

**I. Hague Convention is applicable Because Plaintiff Did Not Perform a Reasonably Diligent Search for Defendant's Physical Address**

Despite Defendant pointing out that its address was readily available from its Amazon Seller's Profile [ECF No. 58 at 2-3], Plaintiff in opposition argues that Defendant's physical address is unknown because its investigation returned zero results for this address nor that the Defendant's business is located at this or any other address. Opposition at 7. Plaintiff's investigation consisted of conducting online searches on multiple search engines. "Once a plaintiff learns of a defendant's purported mailing address, courts require specific proof of a "reasonable investigation" of the address's validity before finding that it is "unknown" under Article 1." *Luxottica Grp. S.p.A. v. Partnerships & Unincorporated Associations Identified on Schedule "A"*, 391 F. Supp. 3d 816, 823 (N.D. Ill. 2019) (citations omitted). When a physical address is identified, reasonable diligence includes utilizing an investigator in China to verify the accuracy of the physical contact address and research alternative addresses for the defendant. *Id.* (citing *Chanel, Inc. v. Song Xu*, 2010 WL 396357, at *1, *3 (W.D. Tenn. Jan. 27, 2010); *see also BP Prods. N. Am., Inc. v. Dagra*, 232 F.R.D. 263, 264 (E.D. Va. 2005). In this case, Plaintiff did not hire an investigator located in China to verify the accuracy of the physical address that was identified in the Amazon Seller's Profile. Moreover, simply because Plaintiff's counsel's own

investigation failed to return any results does not mean the address is not valid, as it is possible that Plaintiff's counsel's failure to locate the address is the product of Plaintiff's counsel's search parameters.

In this case, Defendant submitted the Declaration of Liping Chen [ECF No. 58-2] ("Chen First Decl.") declaring that Room 315, No.111 Bisha Huanchun Street, Shatou Village, Shatou Street, Panyu District, Guangzhou City, Guangdong Province, China, Postal Code 511400 that is identified on its Amazon Seller's Profile is its address. Moreover, this is the same address that is identified as the registered business address for Defendant on its business license. *See* Declaration of Liping Chen ("Chen Second Decl.") at ¶ 3-4, Exhibit A. Every company in China is required to provide a real address as the registered address. *See* *https://www.registrationchina.com/articles/what-is-the-china-business-license/* (explaining the requirements for a business license in China and the information provided on an official business license). The fact that Defendant's official business license identifies the same address as found on the Amazon Seller's Profile is further evidence that the address is authentic.

Moreover, counsel for Defendant also performed a similar online search as Plaintiff's counsel, using Baidu Maps, a well-known and recognized online map service used by many people in China. Declaration of Fengquan Li ("Li Decl.") at ¶ 3. Chinese based map services, like Baidu Maps are more consistent in locating an address in China, especially when searching using Chinese characters as opposed to using an English translation. *Id.* When counsel for Defendant conducted a search for the address by copying and pasting the Chinse characters directly from Kekeduck's Amazon Profile into Baidu Maps, it was able to locate the office building at that address. *Id.* at ¶ 4-6. Simply because Defendant's name may not appear on Baidu Maps for

2

that address does not mean the business was not located at that address. Just like large office buildings in the United States using Google Maps may not list every business/tenant located within the building, it would not be unusual for Baidu Maps to also not list every business/tenant within a large office building. Accordingly, contrary to Plaintiff's assertion, a proper search using Baidu Maps does reveal that the address provided is a real address with a large multi-story, multi-unit office building. Prior to the time of service, and the entry of default judgment, Plaintiff could have had an investigator inspect the office building to confirm Defendant's presence. That would have been reasonable diligence. *Chanel, Inc. v. Song Xu*, 2010 WL 396357, at *1, *3. This Plaintiff did not do, and this district has rejected the type of investigation performed by Plaintiff as not enough to show reasonable diligence. *Peanuts Worldwide LLC v. P'ships & Unincorporated Ass'ns Identified on Schedule "A"*, No. 23CV2965, 2024 U.S. Dist. LEXIS 111501, at * 22 (N.D. Ill. June 25, 2024) ("Plaintiff tries to argue that this address is "unknown or reasonably uncertain" because Plaintiff's counsel was unable to find it on Google Maps, but this is not enough to show reasonable diligence: as Defendant points out, Google's search products do not consistently work in China. In a declaration accompanying its reply brief, Defendant provides screenshots from the Chinese search engine Baidu, as well as from Bing Maps, showing a result at the listed address in Xi'an. This evidence does not necessarily prove that this address is a more reliable means of reaching Defendant than email, but it is sufficient, in the court's view, to establish that Defendant has at least one "known" address such that the Hague Service Convention applies.") (Citations Omitted).

In view of the Chen First Declaration attesting to the address on Amazon's Profile was its business address, Chen Second Declaration providing copy of the official business license showing

its address as the same as on Amazon's Profile, and Li Declaration showing the results of Baidu Maps establishing the address is real and has a multi-story, multi-unit office business thereon, there is at least one "known" address such that the Hague Service Convention applies.

Separately, contrary to Plaintiff's conclusory assertions, email service in China is not necessarily faster, more efficient, and likely to reach Defendant. To be sure, Defendant has no reason to dispute that counsel for Plaintiff attempted to email Defendant. Instead, Defendant states that it did not actually receive the emails that Plaintiff purported to send. ECF No. 58-2, Chen First Decl. ¶ 10. While this may seem strange to many in the United States, it is not unusual for businesses located in China to not receive certain emails, especially those that include links to non-China based websites. This "censorship" is well-known and has received the nickname "The Great Firewall of China." Guo, Steve; Feng, Guangchao, "Understanding Support for Internet Censorship in China: An Elaboration of the Theory of Reasoned Action," *Journal of Chinese Political Science*, 17 (1): 33–52; *See, e.g.*, https://www.maytech.net/blog/the-problem-with-email-communication-in-china (recognizing that China's strict censorship program may mean certain emails to China may be intercepted and not received by the intended recipient); https://learn.microsoft.com/en-us/dynamics365/customer-insights/journeys/improve-deliverability-to-china ("If you're sending email to China, it will be subjected to stricter email filtering than any other country in the world. This could result in email delays, delivered emails with unclickable links, or flat-out non-deliverability"). Defendant does not know the reason why the emails from Plaintiff's counsel does not appear to have been received in its inbox. While Plaintiff indicates that they did not receive a "bounce" back message, that alone does not prove receipt. Indeed, due to China's strict internet filtering system, emails could not be delivered to

the intended recipient without any "bounce" back notification. Notably missing from Plaintiff's declaration is any evidence that they required a "read receipt" message or received such notification. In any event, after learning of this lawsuit and being provided with Plaintiff's service email address, Defendant conducted diligent searches but could not locate the email from Plaintiff's counsel including after the search was broadened to just "GBC" or "Hallmark." [ECF No. 58-2] Chen First Decl., ¶ 10. The point here is that despite Plaintiff's good faith efforts, which Defendant does not fault, email service to defendants located in China is not always guaranteed to be received by the intended recipient. In this case, Defendant did not receive the purported emails serving the Summons and Complaint or any other documents related to this case. *Id.* Instead, Defendant learned of this lawsuit, after entry of default judgment when its PayPal account was frozen. *Id.* at ¶¶ 8-9. In contrast, a physical address for Defendant was readily available from the Amazon profile page and could have been confirmed with reasonable diligence including without limitation looking up Defendant's business license showing that same address. *Id.* at ¶ 4 -6; Chen Second Decl. ¶¶ 3-4.

In its opposition, Plaintiff also cites to several cases that praise the virtues of service by email because of its potential speed and efficiency. While we may be used to the speed and efficiency of email based on our experiences in the United States, that is not always true in China. As discussed above, China's known Great Firewall restricts the flow and access to the Internet and email traffic. There is no certainty that emails originating outside of China using non-Chinese email servers and linking to certain websites outside of China will be delivered. Accordingly, while emails may seem fast and easy, they are of little value when the intended recipient does not receive the emails as is the case here. *See* Chen First Decl. at ¶¶ 10.

II.     **The Hague Convention Does Not Allow Service via Email Unless the Country Permits It**

The Supreme Court has concluded the use of the term "shall" indicates "compliance with the Convention is mandatory in all cases to which it applies." *Volkswagenwerk Aktiengesellschaft v. Schlunk*, 486 U.S. 694, 699, 705 (1988); *see also* Fed. R. Civ. P. 4 advisory committee's notes to 1993 amendment ("Use of the Convention procedures, when available, is *mandatory* if documents must be transmitted abroad to effect service.") (Emphasis Supplied).

Further, the Hague Convention "specifies certain approved methods of service and 'pre-empts inconsistent methods of service' when it applies." *Water Splash, Inc. v. Menon*, 581 U.S. 271, 273 (2017) (*quoting Schlunk*, 486 U.S. at 699). The Convention explicitly authorizes service: (1) "through the receiving country's central authority"; (2) "through various alternative methods" such as "consular channels, service on judicial officers, or service through postal channels" as long as the receiving country has not objected to those methods; and (3) "through methods to which the receiving country has affirmatively agreed or authorized." *Cadence Design Systems, Inc. v. Fenda USA Inc.*, 734 F. Supp. 3d 960, 964 (N.D. Cal. 2024) (*citing* Hague Convention, arts. 2-11, 19). *Smart Study Co. v. Acuteye-US*, 620 F. Supp. 3d 1382, 1393 (S.D.N.Y. 2022) ("As numerous courts have recognized, binding Supreme Court precedent indicates that the Hague Convention outlines specific methods of service, and that methods of service that are not specifically authorized are impermissible under the Convention.")

In other words, in cases in which the Hague Convention applies, service must be effectuated by one of the methods enumerated in the Convention absent some exception. *See Cadence Design Sys.*, 734 F. Supp. 3d at 965 ("[T]he signatories to the Convention have agreed to

make its procedures the exclusive mechanism for service of documents abroad, so methods not authorized under the Convention are 'prohibited by international agreement.' ") (*quoting* Fed. R. Civ. P. 4(f)(3)). "Using a method of service that is not enumerated in the Convention would be tantamount to not 'applying' the Convention, which is expressly prohibited." *Facebook, Inc. v. 9 Xiu Network Shenzhen Tech. Co.*, 480 F. Supp. 3d 977, 983 (N.D. Cal. 2020) (alteration adopted). This district has concluded that "Because email would bypass the methods of service the Hague Convention authorizes, the Convention preempts it as inconsistent." *Luxottica Grp. S.p.A.*, 391 F. Supp. 3d, at 827.

The organization of the Hague Convention is to designate specific methods of service that all "Contracting States" agreed to (Article 5 of the Hague Convention), and then designate additional methods of service that the Contracting States may opt in and opt out (Articles 8 to 11). *See Facebook, Inc.* 480 F. Supp. 3d at 983 (N.D. Cal. 2020) (explaining that "the Convention's structure…enumerates particular methods for serving documents abroad" and the Convention's text "states that the Convention 'shall apply in all cases…where there is occasion to transmit a…document for service abroad," and therefore "[t]he Convention…doesn't simply offer…options that plaintiffs can resort to or not at their discretion…[r]ather, **the Convention-delineated methods of service…are exclusive**") (emphasis added).

**III.** **China's Objection to Article 10 of the Hague Convention for service by postal channels shall be presumed as objection extends to electronic service**

China has expressly objected to service in accordance with Article 10 of the Hague

Convention,[1] when it acceded to the Hague Convention on May 3, 1991.[2] Courts that held China's objection to the Hague Convention's postal service provision does not amount to an objection to email service reasoned that China failed to expressly object to service via email while China objected to Article 10 for postal channels. However, China's lack of objection to email service notice is unsurprising, since the Internet did not exist at the time of the 1965 Hague Convention and most Chinese people, if not all, did not have access to computer networks or email when China deposited the instrument of accession to the Hague Convention in 1991.

Plaintiff's argument that all means of service are permitted under the Hague Convention unless explicitly prohibited runs afoul the canons of treaty interpretation.

Article 11 of the Hague Convention explicitly provides that "[t]he present Convention shall not prevent two or more Contracting States from agreeing to permit, for the purpose of service of judicial documents, channels of transmission other than those provided for in the preceding Articles and, in particular, direct communication between their respective authorities." If all methods of service are permitted *unless explicitly prohibited*, then Article 11 of the Hague Convention would serve no purpose. "Statutes should be construed so that 'no clause, sentence, or word shall be superfluous, void, or insignificant.'" *Republic of Ecuador v. Hinchee*, 741 F.3d 1185, 1191 (11th Cir. 2013). If all channels of transmission are automatically permitted, there is no reason for the Article 11 of the Hague Convention to explicitly state that the Convention "shall not

---

[1] U.S. Marshals Service, *Hague Convention on Service* Abroad, https://www.usmarshals.gov/what-we-do/service-of-process/civil-process/hague-convention-service-abroad (last visited on February 24, 2025).

[2] Hague Conference on Private International Law, *Status Table: China – Declaration/Reservations under the Hague Service Convention*, https://www.hcch.net/en/instruments/conventions/status-table/notifications/?csid=393&disp=resdn&utm (last visited on February 24, 2025).

prevent two or more Contracting States from agreeing to permit … channels of transmission other than those provided for in the proceeding Articles."

More broadly speaking, it is undisputed that the Hague Convention "specifies certain approved methods of service and pre-empts inconsistent methods of service whenever it applies." *Water Splash, Inc.* 581 U.S. at 273 (Where the Supreme Court, in applying the canons of interpretation held that a reading which rendered Article 10(a) of the Hague Convention "superfluous" was therefore "structurally implausible."). The Hague Convention is *not* drafted in a way to allow all possible methods of service by default, and then "prohibit" specific types of methods of service. Instead the organization of the Hague Convention is to designate specific methods of service that all "Contracting States" agreed to (Article 5), and then designate additional methods of service that the Contracting States may opt in and opt out (Articles 8 to 11). Moreover, the Hague Convention did not intend or contemplate that a party may conduct service on another party through every possible means of service in the modern era, including service via social media platforms like TikTok, Instagram or Facebook, via messaging apps such as WhatsApp, Signal, or Telegram, via augmented reality like Snapchat AR Lenses and Meta AR glasses, via virtual reality spaces like Horizon Worlds, via collaborative work platforms like Slack or Microsoft Teams, via interactive livestreaming like Twitch or YouTube Live, or via blockchain-based communication, simply because the framers of the Hague Convention in 1965 did not explicitly forbid those other means of service, which did not exist at the time. *See, e.g., Duong v. DDG BIM Services, LLC, et al.,* 700 F. Supp.3d 1088, 1094 (M.D. Fla. 2023) (rejecting argument that undiscussed method of service in the Hague Convention renders them available by default because, in part, "Both Supreme Court precedent interpreting the Convention and the traditional tools of construction

9

disfavor such a "structurally implausible" interpretation.") (*citing Water Splash, Inc.,* 581 U.S. at 278).

The Court is left with question as to whether China's objection to service via postal channels includes objection to email service. More recent guidance from China makes clear that it objects to email service. For example, on June 24, 2022, the Supreme People's Court posted the Minutes of the National Symposium on Foreign-related Commercial and Maritime Trial Work of Courts (the "Meeting Minutes"), where Article 11 states: "When a People's Court serves a judicial document … in the event that the country where the person to be served is located is a member state of the Hague Convention and objects to the service by mail under the Hague Convention, it shall be presumed that the country does not allow electronic service, and the people's court shall not adopt electronic service."[3]    The Supreme People's Court opine that an objection to service by postal channels includes an implicit objection to service by email.    The Meeting Minutes reflects the Supreme People's Court's view that service by email is invalid because China objected to service by mail under the Hague Convention, and such objection would encapsulate service by email.

The Chinese Central Authority has clarified that email-transferred requests are not accepted.[4]  Service in China must be conducted by a People's Court. Under Article 294 of the 2023 Civil Procedure Law of China ("CPL"), except for treaty-based or diplomatic channels, service of process for foreign litigation must go through Chinese authorities, and direct service by foreign

---

[3] China International Commercial Court, *Provisions on Judicial Matters*, Supreme People's Court of China, https://cicc.court.gov.cn/html/1/218/62/409/2172.html (last visited on February 24, 2025).

[4] China – Central Authority & Practical Information, *The Most Frequently Asked Questions and Answers*, https://assets.hcch.net/docs/5bbc302d-532b-40b1-9379-a2ccbd7479d6.pdf (last visited on February 25, 2025).

agencies or individuals is prohibited. 2023 China Law LEXIS 502, *132-133. Accordingly, the Ministry of Justice unambiguously responded "No" in response to the question "Can a foreign judicial body or individual directly serve documents to a person within China's borders through mail, fax or electronic mail, etc.?" in its published guidance. [ECF No. 58-1] Exhibit A at 4.

Even though the Meeting Minutes and guidance are not formally classified as law in China, the Supreme People's Court and Ministry of Justice use these documents to distribute their views to lower courts and practitioners to guide their actions and are expected to be followed.

While U.S. Courts may authorize alternative service methods under Rule 4(f)(3), such orders should not override the laws of the country where service is attempted. *Kiobel v. Royal Dutch Petro. Co.*, 569 U.S. 108, 115 (2013) ("when a statute gives no clear indication of an extraterritorial application, it has none, and it reflects the presumption that **United States law governs domestically but does not rule the world**.") (internal quotations omitted and emphasis added). U.S. Courts should not impose service methods (*e.g.*, email) that China has effectively rejected under its laws and judicial interpretation of the Hague Convention.

Rule 4(f)(3) permits courts to authorize service by methods not prohibited by international agreement, provided that method comports with constitutional notions of due process. In *Strabala v. Zhang*, 318 F.R.D. 81, 114 (N.D. Ill. 2016), the plaintiff waited six months, and not having heard from the Chinese Central Authority regarding his request for service, he moved the court for alternative service means. The court found it was consistent with due process. However, in this case, the Plaintiff moved for electronic service of process 4 days after it commenced the action. [ECF Nos. 1, 16]

IV.     **Hague Convention is applicable, Article 15 mandates at least six months must elapse from the date of service before a default judgment can be entered.**

Plaintiff argues that Article 15 is not applicable because service was completed pursuant to Rule 4(f)(3), and not "under the provision of the present Convention." Opposition p. 15. Plaintiff's argument is misplaced. [T]he principal concern underlying Article 15 appears to be preventing defaults against defendants who lack actual notice of the action. *See Peanuts Worldwide LLC,* 347 F.R.D. at 332 n. 16 (citing *Lonati S.p.A. v. Soxnet, Inc.*, No. CV 20-5539-GW-JPRX, 2021 WL 9839476, at *2-3 (C.D. Cal. Sept. 20, 2021) (declining to enter default under Article 15 "without any indication of actual notice received by Defendants," but approving alternative service via email under Rule 4(f)(3) as a means of providing this notice); *Burda Media, Inc. v. Viertel*, 417 F.3d 292, 301 (2d Cir. 2005) (noting that "the Hague Convention should be read together with Rule 4, which stresses actual notice, rather than strict formalism.") Article 15(b) further states that a court may enter judgment if "it is established that . . . the document was actually delivered to the defendant or to his residence by another method provided for by this Convention," as long as this service "was effected in sufficient time to enable [them] to defend." Accordingly, even if this Court were to find that email service is not prohibited under the Convention, Defendant has raised a genuine question as to whether and when it had actual notice of the lawsuit. In this case, Defendant submitted a declaration stating that it first learned of the lawsuit when PayPal froze its account after the entry of the default judgment. ECF No. 58-2 (Chen Decl) at ¶ 8-9. After it learned of the lawsuit, Defendant retained counsel who reached out to Plaintiff. *Id.* at ¶ 9. Defendant was informed of the email address from which service would have been made and thereafter performed diligent searches to locate the emails purportedly from

Plaintiff's counsel. *Id.* at ¶ 10. Despite conducting diligent searches for the email identified by Plaintiff's counsel, and broader searches for just "GBC" and "Hallmark", Defendant was unable to locate any of the "service" emails. *Id.* at ¶ 10.

Plaintiff makes the conclusory argument that because it attempted service via email and executed a return of service, Defendant therefore had actual notice. Opposition at p. 15. This argument ignores Defendant's declaration that it performed a diligent search for the email, for any referenced to "GBC" or "Hallmark" and could not locate the email from Plaintiff's counsel, and thus, Defendant did not have actual notice of the lawsuit prior to the entry of default judgment. Moreover, the fact that Plaintiff counsel declares that it never received a "bounce" back message also does not establish that Defendant received the email, and thus actual notice, because China's internet filtering system can silently reject emails, meaning that emails are not delivered and no notification is sent back to the sender. Defendant does not and cannot know if that is what happened here, but it does know based on a diligent search that the emails could not be located. Accordingly, Defendant did not have actual notice of this lawsuit prior to the entry of default judgment. This is exactly the concern underlying Article 15 that it attempts to redress, namely, preventing default against a defendant that did not have actual notice. For this reason alone, the default judgment should be vacated.

Moreover, Plaintiff's argument that Article 15 is foreclosed because it did not complete service through the Hague Convention turns the protections afforded to foreign defendants on its head. The Hague Convention is a multilateral treaty "intended to provide a simpler way to serve process abroad, to assure that defendants sued in foreign jurisdictions would receive actual and timely notice of suit, and to facilitate proof of service abroad." *Schulunk*, 486 U.S. at 698 (1988).

13

Importantly, the Hague Convention "shall apply in all cases, in civil or commercial matters, where there is occasion to transmit a judicial or extrajudicial document for service abroad." *Id.* at 699. There is no dispute that the Hague Convention applies to this case as it involves transmission of judicial or extrajudicial document for service abroad (*e.g.* in China).

## V. Plaintiff's Untimeliness Argument Is Inapplicable to Rule 60(B)(4)

"For motions under Rule 60(b)(4), "the reasonable time criterion of Rule 60(b)...means no time limit, because a void judgment is no judgment at all." *Turnpro LLC v. The Entities, et al.,* No. 21-cv-02763 (N.D. Ill. June 24, 2022) (Bucklo, J.) (ECF No. 105 at 3) (unpublished), (citing *Rodd v. Region Constr. Co.*, 783 F.2d 89, 91 (7th Cir. 1986) (internal quotation marks omitted). Defendant's motion is timely based on this well-established law. Nevertheless, Plaintiff cites *Philos Techs., Inc. v. Philos & D, Inc.,* 645 F.3d 851, 857 (7th Cir. 2011) with an out of context quote for the proposition that "[Rule 60(b)(4)] 'does not preserve in perpetuity a party's claim regarding personal jurisdiction, regardless of any strategy it pursues in the district court." Opposition at 15. That quote from *Philos Techs.,* however, was not about the timeliness of a Rule 60(b)(4) motion but rather the defendant's need to decide what strategy to pursue in the district court. Indeed, the very next sentence after the sentence that Plaintiff's quoted, the court stated "A defendant cannot switch strategies midstream—if the defendant appears and challenges the court's personal jurisdiction but then abandons that defense, the defendant may not later reassert that defense in a collateral challenge to the judgment under Rule 60(b)(4) or otherwise." *Philos Techs.,* 645 F.3d at 857. The reason that was important in *Philos Techs.* was because prior to defendants appearing with an attorney and filed a Rule 60(b)(4) motion, the defendants sent a *pro se* letter to the court denying any culpability or involvement in the matters alleged the Complaint. As the court went onto explain, "The pivotal question here, then, is whether any of the defendants appeared to

challenge the district court's jurisdiction. If they did, then their motion to vacate was improper and we would need to dismiss this appeal. But if the defendants did not appear to challenge the district court's jurisdiction, then they could bring their Rule 60(b)(4) motion at any time, and the denial of that motion on timeliness grounds was erroneous." *Id.* (internal citations omitted).

While the *Philos Techs.* case does not support Plaintiff's argument regarding timeliness, that case does reaffirm the timeliness of Defendant's motion here. In that case, defendants had actual knowledge of the lawsuit by sending a *pro se* letter to the district court. It then waited sixteen months after the *pro se* letter and more than a year after default judgment was entered before appearing with counsel to file a Rule 60(b)(4) motion. Nevertheless, the Seventh Circuit *reversed* the district court for denying defendants' Rule 60(b)(4) motion as untimely. *Philos Techs.,* 645 F.3d at 856 - 857. The Court went on to recognize the well-settled law that "in regard to motions under Rule 60(b)(4), "the 'reasonable time' limitation in [Rule 60(c)(1) ] 'must generally mean no time limit,'" *Id.* at 857. In contrast, in this case, Defendant did not have actual notice of this lawsuit until well after the entry of default and filed a Rule 60(b)(4) motion shortly after it learned of this lawsuit, attempts at settlement broke down, and in any event, less than a year of the entry of default. While those factors are not relevant for a Rule 60(b)(4) motion because the reasonable time limitation of Rule 60(c)(1) must generally mean no time limit, they further distinguish the facts in *Philos Techs.,* from the present case. Plaintiff's untimeliness argument is inapplicable and should be rejected.

## CONCLUSION

Based on the arguments and evidence presented in the moving papers and here on reply, Defendant respectfully request that the court vacate the default judgment against Defendant, and grant other relief the Court deems just and proper.

Dated:   February 25, 2025                                     Respectfully Submitted,


   */s/ Anthony H. Son*

Anthony H. Son, Esq. (Bar No. 46465146)
*Of Counsel*
Email: ason@dgwllp.com
DGW KRAMER LLP
45 Rockefeller Plaza, 20th Floor;
New York, NY 10111
Tel: (213)592-1908
*Attorneys for Defendant kekeduck (29)*

16

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on February 25, 2025, all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's electronic case filing system. Any other counsel of record, if any, will be served by first class mail.

*/s/ Anthony H. Son*

Anthony H. Son